Samuel SAUL, Jr. and Rack Engineering Company, a Partnership (now Rack Engineering Corporation), Plaintiffs,

v.

INTERNATIONAL HARVESTER COMPANY, a corporation, Defendant.

Civ. A. No. 6031.

United States District Court
E. D. Wisconsin.

Jan. 20, 1959.

Charles L. Byron, Chicago, Ill., and Peter P. Price, Grand Rapids, Mich., for defendant.

GRUBB, District Judge.

Plaintiffs Samuel Saul, Jr. and Rack Engineering Company, now Rack Engineering Corporation, claim infringement of the Saul Patent No. 2,626,711, dated January 27, 1953, which relates to an adjustable peg rack. They also claim defendant has been unjustly enriched by its fraudulent and improper use of plaintiffs' properties.

Samuel Saul, Jr. is the owner of the patent in suit; the Rack Engineering Company was, and the Rack Engineering Corporation is licensed to have the product disclosed in the patent manufactured and sold.

The patent in suit relates to a peg rack for use in handling materials. Peg racks, or gear racks as they are known in the trade, are designed to facilitate the storage and transportation of gears of various shapes and sizes to the proper locations in an assembly plant where they are to be utilized in the manufacture of equipment, such as tractors.

Gear racks have been used in industrial operations from almost the beginning of mass production operations. Fundamentally they comprise a base usually supported on wheels or casters with some kind of an upright structure from which protrude pins. (Plaintiffs' brief, p. 2) After gear blanks are cut into gears, they can be damaged by improper handling. By using a gear rack, the gears, which have a hole at the center or hub, can be slid upon the protruding pins of the gear rack. Each pin is long enough to hold several gears, and since there are a number of pins on each rack, a large number of gears can be mounted on the rack and the rack may then be wheeled to a place where the gears are to be utilized in some assembly or operation.

The peg rack disclosed by the patent in suit is a development that resulted from a series of transactions between plaintiffs and the defendant's Louisville Works. In 1947 Mr. Saul sold to the Louisville Works a number of compartmented hook

William H. Parmelee and Elmer S. Utzler, Pittsburgh, Pa., for plaintiffs.

racks for use in handling materials. After some period of experience with the compartmented hook rack the Louisville Works became dissatisfied with it and determined the rack had to be improved, or a new rack substituted.

The solution to this problem was found in an improved rack which was designed to meet the requirements of the Louisville Works and manufactured for the defendant by the plaintiffs. This rack, purchased from the plaintiffs in December 1948, is the same as that disclosed by the patent in suit. There is attached to this opinion a photostat of the drawings of the patent in suit.

Jan. 27, 1953    S. SAUL, JR., ET AL    2,626,711

ADJUSTABLE PEG RACK

Filed Dec. 6, 1948     2 SHEETS—SHEET 1

Fig.1.

Fig.2.

Fig.3.

Fig.4.

Fig.5.

INVENTORS
SAMUEL SAUL JR. &
LLOYD H. FENSTERMAKER.
BY
Christy, Parmelee, & Strickland
ATTORNEYS.

On December 6, 1948 Mr. Saul and Mr. Lloyd H. Fenstermaker filed their application for the patent in suit. As stated by Chief Judge Duffy with reference to another patent, "The application for the patent in suit had a somewhat rough road to travel before the patent was issued." Carborundum Company v. National Tea Company, 7 Cir., 262 F.2d 277. The patent was granted January 27, 1953.

November 8, 1949 Rack Engineering Company contacted the defendant's Milwaukee Gear Works through a Mr. Gordon Lowe in an attempt to sell to the Milwaukee Works, Rack Engineer conveyor racks.

Immediately thereafter a Mr. Ray Seidens, then the material handling man at the Milwaukee Works, saw plaintiffs' adjustable peg rack during a visit to the Louisville Works for the purpose of attending a materials handling conference. On Seidens' return to Milwaukee he told Gordon Lowe that he saw the Rack Engineer peg trucks and that he liked them very much.

Rack Engineer made subsequent contacts with the Milwaukee Works between 1949 and 1952, and in 1952 sent to the Milwaukee Works drawings of Rack Engineer's adjustable peg rack, and demonstrated the loading of gears on a model of a peg rack shipped to Milwaukee for that purpose. Plaintiffs' rack was displayed openly at the Milwaukee Plant and observable to all callers.

The Milwaukee Works also received a drawing of an adjustable peg rack from the Borne Company, which drawing Borne had obtained from the Louisville Works.

Under date of October 7, 1952 the Milwaukee Works prepared its own drawing of an adjustable peg rack, different in some respects from the Rack Engineer and Louisville drawings, and submitted copies of this drawing to manufacturers, including the plaintiffs, for the purpose of securing bids on peg racks which it proposed to purchase. Subsequently the Milwaukee Works did purchase the accused peg racks from the Brummeler Company.

### Issues

This action involves two basic issues:

1. Has the defendant infringed any valid patent right of plaintiffs arising out of U. S. Patent 2,626,711?

2. Has there been a secret or confidential relationship between plaintiffs and the defendant or any unjust enrichment by defendant at the expense of the plaintiffs?

Defendant has asserted the following defenses:

1. The patentees were not the inventors of the claimed subject-matter, and they, the patentees, wrongfully appropriated the claimed subject-matter which was conceived and developed by employees of defendant at its Louisville Works.

2. The Saul patent is invalid because (a) it does not exhibit invention, and (b) both its claims recite merely an unpatentable aggregation.

3. The patent is not infringed.

4. No confidential relationship existed between plaintiffs and defendant. Defendant was not unjustly enriched at the expense of the plaintiffs.

### Were The Patentees The Inventors?

Plaintiffs contend Saul and Fenstermaker developed the ideas which culminated in the patented adjustable peg rack. The evidence is convincing beyond the reasonable doubt, however, that before Mr. Saul was brought into the problem of manufacturing an improved rack, the employees of the Louisville Works had constructed a full-size model rack sufficiently completed to determine it was the rack they wanted, which model incorporated substantially all of the ideas that ultimately found their way into the patent. About June 1948 the model of the defendant was exhibited to Mr. Saul at the Louisville Plant and Mr. Saul stated that he understood what was wanted and would produce it.

It is the further finding of the court that before the defendant directed the plaintiffs to manufacture the new rack for it, the employees at Louisville had

conceived and developed every element recited in the claims of the patent and had communicated their ideas to Saul with the direction that they be incorporated into the quotation which Saul might submit. The court finds that the patent is invalid because Mr. Saul and Mr. Fenstermaker were not the inventors.

### Invention

In plaintiffs' counsels' own words, "Gear racks as such have been used in industrial operations from almost the beginning of mass production operations. Fundamentally they comprise a base usually supported on wheels or casters with some kind of an upright structure from which protrude pins." Plaintiffs state that the novel development of their combination is in providing a more flexible rack with pins which can be quickly removed and replaced in different positions, and in providing a rack with supporting channels close enough together so that larger gears can obtain support from the adjacent channels as well as from the channel upon which they directly rest.

■ A patent is prima facie valid, and the burden of establishing invalidity of a patent rests on the party asserting it. 35 U.S.C. § 282. "Furthermore, it is well settled that where the alleged invalidity is based upon a patent which was before the Patent Office and was rejected as an anticipation of the invention, the presumption of novelty and invention is greatly strengthened. * * *" Paragon-Revolute Corporation v. C. F. Pease Company, 7 Cir., 1957, 239 F.2d 746, 748.

■ Notwithstanding these rules, it is the finding of this court that each element of the claims of the patent is old and that the combination of old elements here involved does not rise to the dignity of invention. The providing of

removable pegs is not only old in prior art, but in the very field of gear racks, a unit with U-shaped channels and easily removable pegs inserted through aligned openings was sold by the manufacturer of the accused device some ten months before the patent in suit was filed. Such contemporaneous and even prior conception weighs heavily upon the claim of inventive faculty involved in the patented device.

But even if the Brummeler adjustable peg rack with U-shaped channels had not existed prior to the plaintiffs' claimed invention, the existence in the prior art[1] of each element of the claims in suit, together with the prior state of gear racks, is such that the structural differences over the prior art amount to nothing more than routine mechanical skill.

The Saul Patent does not exhibit invention and, therefore, is invalid. Hyster Company v. Hunt Foods, Inc., 7 Cir., 263 F.2d 130.

In Great Atlantic & Pacific Tea Co. v. Supermarket Equipment Corp., 1950, 340 U.S. 147, 152, 71 S.Ct. 127, 130, 95 L.Ed. 162, the court severely criticized the granting of patents for devices which consisted of an assembly of old elements performing their old and well-known functions. The court stated:

"Courts should scrutinize combination patent claims with a care proportioned to the difficulty and improbability of finding invention in an assembly of old elements. The function of a patent is to add to the sum of useful knowledge. Patents cannot be sustained when, on the contrary, their effect is to subtract from former resources freely available to skilled artisans. A patent for a combination which only unites old elements with no change in their respective functions, such as is pre-

---

1. Alderman Patent 2,050,775 suggests closely spaced sloping slats, from which protrude pins; see also Babcock Patent 931,669, Cronin Patent 613,760, Norton Patent 1,698,318; Saul's earlier Patent 2,316,892 suggests removable pins; Ohme Patent 2,246,692 suggests U-shaped channels with pegs inserted through larger front openings and through reduced rear openings; see also Lehman Patent 1,380,570, Hecker Patent 686,063, Hade Patent 2,451,674.

sented here, obviously withdraws what already is known into the field of its monopoly and diminishes the resources available to skillful men. This patentee has added *nothing to the total stock* of knowledge, but has merely brought together segments of prior art and claims them in congregation as a monopoly."

■ "To be patentable, a combination of individually old elements must be new, and those elements must cooperate to produce a new and unexpected or unobvious result. * * *" Powder Power Tool Corp. v. Powder Actuated Tool Company, Inc., 7 Cir., 1956, 230 F.2d 409, 415. The Saul Patent is not a patentable combination.

### Infringement

■ The patent in question contains two claims.[2] Each claim relates to a peg rack comprised of a number of U-shaped channels lined up parallel to each other so that their front flanges provide supporting surfaces, the channels being tied together at the top and bottom and each channel containing a number of openings in the front flange aligned with openings in the rear flange, through which pegs may be inserted, which pegs may thereby provide support for some article such as gears.

Defendant's contention that the claims do not read on the accused structure is primarily based upon the argument that the claims relate to a self-contained rack

2. 1. In a peg rack, a slat-like supporting structure comprising a pair of spaced end angle sections each having a flange in a common plane and an upstanding flange in spaced parallel planes which are substantially normal to said common plane, a plurality of parallel U-shaped channel sections extending between and normal to said angle sections with the ends thereof connected to said upstanding flanges, said channel sections having parallel webs perpendicular to said common plane with each channel section web having upper and lower parallel flanges, the ends of each of said lower flanges resting on one of said angle section flanges in said common plane, said channel sections being spaced with their upper flanges forming parallel supporting surfaces having narrow elongated slots therebetween, said parallel supporting surfaces cooperating to provide a slat-like support on which an article may be supported by a plurality of said parallel supporting surfaces, said upper and *lower flanges on each of said channel* sections having a plurality of pairs of aligned openings therein, said openings in said upper flanges being larger than the openings in said lower flanges, and a peg support movable endwise through a selected pair of said openings to a position supported by the flanges of one of said channel sections so that an article may be hung thereon and prevented from sliding movement over said slat-like supporting surface, said peg having a body portion of a size such that it will move through said larger openings but have a

snug fit therein, and a reduced end projecting from said body portion for movement through said smaller openings, the formation of said peg with a reduced end providing a shoulder at the end of said peg body portion engageable with one of said lower flanges in an area around an opening therein to limit endwise movement of said peg to a mounted position.

2. In a peg rack, a slat-like supporting structure comprising a pair of transversely extending end structural sections, a plurality of parallel U-shaped channel sections extending between and normal to said structural sections, the ends of said *channel sections being rigidly secured to* said structural sections, said channel sections having parallel webs with each web having upper and lower parallel flanges, all of said upper flanges and all of said lower flanges being respectively positioned in spaced parallel planes, said channel sections being spaced with their upper flanges forming parallel supporting surfaces having *elongated slots* therebetween, said parallel supporting surfaces cooperating to provide a slat-like support on which an article may be supported by a plurality of said parallel supporting surfaces, said upper and lower flanges on each of said channel sections having a plurality of pairs of aligned openings therein, and a peg support movable axially endwise through a selected pair of said openings to a position supported by the flanges of one of said channel sections so that an article may be hung thereon and prevented from sliding over said slat-like supporting surface.

separate and distinct from any truck or other mechanism used to support it. Defendant's rack, however, depends upon the deck of the truck and the top angle section to tie the supporting channels of the rack together, and without them defendant's unit would not be a functional rack.

Counsel for the defendant admits that his argument of file wrapper estoppel is basically the same argument that the claims are limited to a self-contained rack separate and distinct from any supporting unit.

■ This court is of the opinion that the accused structure infringes both claims of the patent. The accused structure contains each element or its equivalent. Defendant's substitution of angle section six to perform the function of angle section nine and substitution of a heavier deck and beveling the channel sections to perform the functions of angle section ten does not avoid infringement. The top angle section and deck of the accused device tie the channel sections together in substantially the same way as the patented device to produce substantially the same result. Ingersoll Milling Machine Co. v. General Motors Corp., D.C.N.D.Ill.E.D.1952, 110 F.Supp. 12 affirmed 7 Cir., 1953, 207 F.2d 42.

### Confidential Relationship And Unjust Enrichment

■ The evidence discloses that the plaintiffs spent time and effort in an attempt to sell their rack conveyor equipment to the Milwaukee Works. These dealings were typical of those between a prospective vendor and a prospective vendee. Nothing at any time was indicated as being confidential; nothing was kept confidential. No request was made to keep anything confidential, although there was stamped on one of the drawings "This print is not to be used in any way detrimental to us, or for competitive purposes and must be returned on request." The rack was publicly displayed to the knowledge of plaintiffs' salesmen.

The court finds significant, however, that the Milwaukee Works material

handling man had seen the Rack Engineer adjustable peg rack in defendant's Louisville Plant before any confidential disclosures could have occurred. Further, it is the finding of this court that the Milwaukee Works did not distribute copies of plaintiffs' drawings of the Rack Engineer adjustable peg rack, but after having examined the Rack drawings and the Borne-Louisville drawing, prepared its own drawing different in some respects from both the plaintiffs' and the Borne-Louisville drawing, and submitted it to manufacturers including the plaintiffs for bids.

It is the conclusion of this court that the defendant did not violate any confidential relationship, nor did it become unjustly enriched at the expense of the plaintiffs.

While the court believes that the findings of fact and conclusions of law on all material issues are set forth clearly in the above opinion, nevertheless, the court directs defendant's counsel to prepare formal findings of fact and conclusions of law and order for judgment in conformity herewith, submitting them to plaintiffs' counsel for approval as to form only.